IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES E. FERACE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1259 |
| | ) | |
| EDMUND S. HAWLEY, | ) | Hon. Nora Barry Fischer |
| ADMINISTRATOR, | ) | U.S. District Judge |
| TRANSPORTATION SECURITY | ) | |
| ADMINISTRATION AND | ) | |
| DEPARTMENT OF HOMELAND | ) | |
| SECURITY, TRANSPORTATION | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

**I.**   **Introduction**

This is an action seeking declaratory and injunctive relief and damages for alleged

retaliation in violation of the First Amendment rights of free speech and association.  Plaintiff

James E. Ferace ("Plaintiff") is a former employee of the Transportation Security Administration

("TSA") who claims that he was unlawfully discharged because of his active and open efforts in

an attempt to unionize the screening department of the Pittsburgh International Airport. (Complaint at Docket No. 20 ("Complaint") at ¶¶ 4, 17, 26).

Presently before this Court is Defendants' Motion for Summary Judgment ("Defendants' Motion"). [DE 58].   The matter has been fully briefed by the parties. [DE 59, 67, and 69]. Pursuant to Local Rule of Court ("LR") 56.1(B)(1), Defendants set forth a concise statement of material facts. [DE 60].   Plaintiff, however, failed to respond to these statements in accordance with LR 56.1(C)(1), and consequently, the facts set forth in the concise statement of material facts submitted by Defendants are deemed to be admitted by Plaintiff for the purpose of the instant motion, in accordance with LR 56.1(E).[1] *Benko v. Portage Area School Dist.*, 2006 WL 1698317 (W.D. Pa. 2006); *Smith v. Burrows Corp.*, 2005 WL 2106594 (W.D. Pa. 2005); *Loving v. Borough of East McKeesport*, 2005 WL 3560661 (W.D. Pa 2005) (movant's facts admitted because non-movants failed to respond to movant's statement of material facts, pursuant to LR 56).

For the reasons set forth below, Defendants' Motion [DE 58] is GRANTED.

---

[1]Plaintiff was provided further notice of these procedures in the Case Management Order dated September 25, 2006. Docket No. 46 at ¶ 10 ("The party opposing a motion for summary judgment must respond to the movant's statement of undisputed facts paragraph by paragraph by either admitting or denying that a proposed fact is undisputed").  Again, Plaintiff was provided with further notice of his failure to comply with the local rule when Defendants filed their Reply in Support of Their Motion for Summary Judgment (Docket No. 69) and Defendants' Response to Court Order Directing Parties to File Joint Statement of Material Facts Not in Dispute (Docket No. 71), both of which raised the issue of Plaintiff's failure to comply with the local rule.  Still, Plaintiff failed to file, or even request leave to file, a responsive statement of facts as set forth in LR 56.1.  Instead, on July 25, 2007, Plaintiff filed a "Statement of Material Fact" (Docket No. 73) in which Plaintiff purports to incorporate by reference the statement of facts contained within its Opposition to Defendants' Motion for Summary Judgment (Docket No. 67) and allege several facts Plaintiff believes are in dispute.  As set forth above, this does not comply with the local rule.

2

## II.   Factual Background

### A.   Plaintiff's Employment with TSA

Plaintiff is a former employee of TSA, a component of the United States Department of Homeland Security.   (Docket No. 60, Defendants' Statement of Undisputed Material Facts in Support of Summary Judgment, ("SOF") at ¶ 1).   TSA was established in the aftermath of the September 11, 2001 terrorist attacks and was tasked with the security mission of preventing dangerous passengers and cargo from boarding aircraft.   SOF at ¶¶ 2, 5.   Plaintiff began work with TSA as a federal airport security screener at the Pittsburgh International Airport on August 28, 2002. SOF at ¶ 3.   A screener's primary responsibility is to provide front line security and protection for air travelers, airports, and airplanes, by identifying dangerous objects in baggage, cargo, and on passengers and preventing such objects from being transported onto aircraft.   SOF at ¶ 5.   Plaintiff was primarily a "checkpoint" screener and was responsible for screening individuals as they walked through metal detectors and for screening carry-on baggage.   SOF at ¶ 6.   As a federal airport security screener, Plaintiff was required to serve a one-year probationary employment period.   SOF at ¶ 69.   During this probationary employment period, Plaintiff could be terminated if his supervisors found that his performance or conduct were deficient. SOF at ¶ 69.

Shortly after he began working for TSA, Plaintiff became affiliated with the American Federation of Government Employees ("AFGE"), a labor union of federal government employees that was active in attempting to unionize the TSA workforce.[2]   SOF at ¶¶ 17, 20.   In

---

[2]The AFGE is a labor organization that represents approximately 700,000 federal government workers by, among other things, negotiating collective bargaining agreements, arbitrating grievances, filing unfair labor practices, lobbying, and litigating various disputes on behalf of its members. Complaint at ¶ 3.

the fall of 2002, Plaintiff began serving as AFGE's Pittsburgh Airport point of contact. SOF at ¶ 20.  As the Pittsburgh Airport point of contact, Plaintiff was the first to act in furtherance of AFGE's "campaign to organize TSA screeners for the purposes of obtaining recognition as the [sic] their exclusive representative and securing collective bargaining."  Complaint at ¶ 3. Specifically, Plaintiff "actively and openly engaged in the effort to organize TSA employees [at the Pittsburgh Airport] for the purpose of securing collective bargaining and other protections," by distributing union materials, organizing meetings, speaking with employees about the union, and administering a website on the union's behalf.  Complaint at ¶¶ 4, 17; SOF at ¶ 21.  Plaintiff claims that all his unionizing activity occurred during "off duty" hours and in locations outside the workplace such as the airport parking lot and local hotels where the union meetings were held.  SOF at ¶ 21.

When he began his employment with TSA, Plaintiff acknowledged that he understood the various TSA policies regarding professional conduct in the workplace and his obligation to maintain the security of sensitive information.  SOF at ¶¶ 7-16.  On August 26, 2002, Plaintiff signed a document affirming that he understood Sensitive Security Information ("SSI") and pledged to abide by regulations controlling its unlawful disclosure thereof, including disclosure on a website not approved by TSA.[3]  SOF at ¶7.  On January 15, 2003, Plaintiff signed his "Employee Performance Agreement" and pledged to "work as an effective team member," contribute to the accomplishment of TSA's mission and vision, and "conduct [himself] in a way

---

[3]49 CFR 1520 "governs the maintenance, safeguarding, and disclosure of records and information that TSA has determined to be Sensitive Security Information."  Pursuant to 49 CFR 1520, "SSI is information obtained or developed in the conduct of security activities . . . the disclosure of which TSA has determined would. . . [b]e detrimental to the security of transportation." 49 CFR 1520.5(a); (a)(1).  Additionally, TSA's "Interim Sensitive Security Information Policies and Procedures for Safeguarding and Control" explicitly states that "[a]ny information that TSA has determined may reveal a vulnerability of aviation facilities to attack" constitutes SSI. Def. Ex. A at 67-78.

that supports TSA's values." SOF at ¶ 8.  On February 10, 2003, Plaintiff acknowledged that he received and read a copy of HRM Letter No. 735-1, which establishes standards of behavior and ethical conduct for TSA employees, the breach of which may result in disciplinary or other corrective action.  SOF at ¶¶ 9-16.

In February 2003, Plaintiff disclosed confidential TSA information regarding a security breach on a website that he maintained for the union.  SOF at ¶ 33, 35.  As a result of Plaintiff's disclosure, this sensitive information was later publicized in newspapers, television, and radio. SOF at ¶ 34.  Plaintiff's disclosure constituted a breach of TSA policy that mandated the strict adherence to protecting SSI.  SOF at ¶ 33.  Plaintiff also placed demeaning comments and "character assassinations" regarding his fellow TSA employees' dress, background, and personal appearance on his website.  SOF at ¶¶ 37-38.  Former Federal Security Director Robert Blose ("FSD Blose") testified that Plaintiff's character assassinations included a caricature of one young female employee who was portrayed on Plaintiff's website with huge buckteeth.  SOF at ¶ 38.

On February 26, 2003, Plaintiff was counseled by FSD Blose and signed a Memorandum of Counseling relating to Plaintiff's release of SSI on the union website he maintained.  SOF at ¶ 36.  As the result of this offense, FSD Blose requested Plaintiff's immediate termination because Plaintiff's conduct was detrimental to the good order and discipline of the TSA workplace.  SOF at ¶¶ 37, 41.  Despite Plaintiff's probationary status, his February 2003 counseling incident, and FSD Blose's push to terminate Plaintiff, TSA Headquarters ("Headquarters") decided to retain Plaintiff.  SOF at ¶ 44.  FSD Blose testified that Headquarters was especially cautious about

firing Plaintiff in order to prevent the appearance of retaliating against an individual with union affiliation.  SOF at ¶ 44.

On May 1, 2003, Plaintiff was given another letter of counseling relating to his failure to follow proper procedures for requesting sick leave. SOF at ¶¶ 47, 50.  The failure to provide a specific reason for taking sick leave violates FAA Order 3600.4, provisions of HRM Letter 735-1, and TSA Pittsburgh Memorandum 2003-85.  SOF at ¶ 50.  Plaintiff admitted that he failed to follow appropriate sick leave procedures after he called in sick and refused to state the nature of his illness, but refused to sign the Letter of Counseling because he felt that doing so implicated "medical privacy issues."[4]  SOF at ¶ 49.

On May 20, 2003, Plaintiff committed another infraction of TSA policy by approaching his supervisor's podium and sorting through daily records of each screener's performance. SOF at ¶ 52.  After he obtained the evaluation comments of his team members, Plaintiff approached two screeners and disclosed to them the negative comments that were written about them in their evaluations.  SOF at ¶¶ 52, 59.  Upon receiving the evaluation comments, the screeners became visibly upset; one even began to cry.  SOF at ¶ 60.  This incident had a significant impact during this time period due to an ongoing tension among TSA employees over a reduction in force that required Pittsburgh International Airport to reduce its screening force by approximately 40 percent; additionally, during the Spring/Summer of 2003, a nationwide reduction of screeners resulted in TSA slating for termination approximately 6,000 screeners. SOF at ¶ 61.  On June 2,

_____

[4]The Court notes that this is not Plaintiff's first incident of unauthorized absence, nor is this his first employment discrimination case.  Plaintiff was previously employed as an air traffic controller with the Federal Aviation Administration ("FAA"), but was terminated for unauthorized absence.  Plaintiff filed a subsequent employment discrimination lawsuit in the United States District Court for the Western District of Pennsylvania, alleging that such termination was unlawful.  That lawsuit was dismissed pursuant to Federal Rule of Civil Procedure 56 in favor of the FAA.  Def. Ex. A at 1-5; Def. Ex. B at 4-5, 13-14, 21;  *see also Ferace v. Hon. Rodney Slater, Security of Transportation*, Case No. 99-1610 (W.D. Pa. 2001).

2003, Human Resources Specialist Donna Hajduk notified Fred Pope, Employee Relations Specialist for Northeast Headquarters of TSA, of the May 20, 2003 incident and Plaintiff's other counseling incidents and recommended that a one day suspension be issued.  SOF at ¶ 62.  Ms. Hajduk's letter to Mr. Pope stated that "Ferace continues to disregard TSA and local policies and his behavior impairs the efficiency of Pittsburgh International Airport."  SOF at ¶ 63.  In making this disciplinary recommendation, Ms. Hajduk did not consider Plaintiff's union affiliation.  SOF at ¶ 64.

In 2003, all disciplinary decisions were made at Headquarters in Washington, D.C. SOF at ¶ 65.  Local managers and officials could only make recommendations regarding termination and disciplinary action; they did not have the authority to authorize termination or disciplinary action of their own employees.  SOF at ¶ 65.  On July 7, 2003, Assistant FSD ("AFSD") Martelle and Manager Rough signed a document requesting Plaintiff's termination.  SOF at ¶ 66. Mr. Pope reviewed Plaintiff's file and recommended that his various infractions supported termination, especially given Plaintiff's status as a probationary employee.  SOF at ¶ 69.  On July 10, 2003, Plaintiff signed a "Termination During Probationary Period" letter delivered and signed by AFSD Martelle, dated July 9, 2003.  SOF at ¶ 67.  The letter notified Plaintiff that he was being terminated due to "misconduct" as a result of his unauthorized access and disclosure of daily logs and his other counseling incidents.  SOF at ¶ 67.

Mr. Pope, Former FSD Martelle, Former Manager Rough and FSD Blose all unequivocally agreed that Plaintiff's termination was due to misconduct and had nothing whatsoever to do with Plaintiff's union affiliation.  SOF at ¶¶ 71-73, 82.  In fact, Former FSD Blose testified that Plaintiff's claim that he was terminated due to union affiliation was a

"spurious charge" and "absolutely untrue" and further testified, "I feel absolutely positive . . . I will go to my grave saying he was not terminated due to his union activities, he was terminated for character issues and violations of TSA policies."  SOF at ¶ 82.  Additionally, Plaintiff admitted that none of his managers ever specifically told him to stop associating with the union, nor did they specifically prohibit him from conducting union activities.  SOF at ¶¶ 30-32.

### B.      Procedural History

On January 8, 2003, Former TSA Administrator James Loy ("Loy") issued a memorandum stating that in light of the screeners' "critical national security responsibilities, [they] shall not . . . be entitled to engage in collective bargaining or be represented for the purpose of engaging in such bargaining by any representative or organization" (hereinafter, "the Loy Determination").  SOF at ¶ 25.  Loy subsequently issued a second memorandum stating that "employees are still free to engage in employee organization activities as long as they do not do so on work time and it does not interfere with [the TSA's] security work or otherwise undermine aviation security."  SOF at ¶ 26.  Moreover, TSA continually stressed that TSA management should maintain strict neutrality on the subject of unions.  SOF at ¶ 29.  Several former TSA managers testified that TSA was extremely cautious when it came to discussions about the union and that they did not perceive any animus toward the union within the TSA organization.  SOF at ¶¶ 72-74, 80-81.

Starting in November 2002, AFGE filed numerous petitions with the Federal Labor Relations Board ("FLRA") in order to obtain recognition as the exclusive representative of TSA employees at various airports throughout the country.  While the AFGE's petitions were pending before the FLRA, the AFGE filed a complaint in the United States District Court for the District

of Columbia on January 10, 2003, alleging that: (1) Loy did not have statutory authority to issue

the Loy Determination; (2) the Loy Determination 'deprives plaintiffs of their rights of free

speech and association under the First Amendment'; (3) the Loy Determination 'deprives

plaintiffs of their right to equal protection under the law guaranteed by the Fifth Amendment to

the United States Constitution'; and (4) the Loy Determination 'is contrary to Pub.L. 107.71, §

101(n) and otherwise is arbitrary and capricious under the standards set forth in 5 U.S.C. § 706.'

*Am. Fed. of Gov't Employees v. Loy* ("*Loy II*"), 332 F.Supp.2d 218, 220 (D.D.C. 2004); *see also*

*Am. Fed. of Gov't Employees v. Loy* ("*Loy I*"), 281 F.Supp.2d 59 (D.D.C. 2003).

On July 8, 2003, AFGE's petitions were dismissed by the Regional Director of the FLRA

on jurisdictional grounds. Complaint at ¶¶ 11-13, 18.   Accordingly, "[t]he AFGE. . . was

permitted to supplement its complaint to allege that 'TSA has applied the Loy Determination to

threaten employees with discipline and/or termination for conducting union organizing activities

while not on duty in violation of the First Amendment . . . and that Ferace was discharged on the

day after' the FLRA issued its decision to dismiss the union's petitions for an election." *Loy II*,

332 F.Supp.2d at 220.

On September 5, 2003, the United States District Court for the District of Columbia

("D.C. Court") severed Plaintiff's individual First Amendment complaint from the suit, and

ordered him to refile the complaint.   *Loy I*, 281 F.Supp.2d at 66 n.6.   The D.C. Court also

dismissed AFGE's statutory claims "for lack of jurisdiction under Rule 12(b)(1) of the Federal

Rules of Civil Procedure [and] [t]he constitutional claims . . . for failure to state a claim under

Rule 12(b)(6)."  *Id.* at 66.   The United States Court of Appeals for the District of Columbia

9

Circuit subsequently affirmed the dismissal of those claims.  *Am. Fed. of Gov't Employees v. Loy*, 367 F.3d 932 (D.C.Cir. 2004).

AFGE and Plaintiff subsequently filed this Complaint in the D.C. Court on September 17, 2003, alleging that "Defendants have deprived plaintiffs of their right to engage in organizational and other expressive activity in violation of the First Amendment to the United States Constitution," that "Defendants have deprived plaintiffs of their right to engage in First Amendment activity in a manner that also violates the equal protection of law guarantee of the Fifth Amendment to the United States Constitution," and that Plaintiff was unlawfully discharged "in retaliation for exercising his rights to freedom of speech and association in violation of the First Amendment to the U.S. Constitution." Complaint at ¶¶ 22, 24, 26.  Counts I and II of the Complaint were dismissed as barred by *res judicata*.  *Loy II*, 332 F.Supp.2d at 226-27.  Additionally, on May 18, 2005, Plaintiff AFGE was dismissed, and this case was transferred to this Court from the D.C. Court.

Defendants filed their motion for summary judgment on March 16, 2007.  Thereafter, the Court held a status conference to determine the potential, if any, for alternative dispute resolution, which Defendants denied.  Accordingly, the Court addresses the motion at this time.

### III.   <u>Standard of Review</u>

Summary judgment may only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56©).  Pursuant to Rule 56, the Court must enter summary judgment against the party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In evaluating the evidence, the court must interpret facts in the light most favorable to the non-moving party, and draw all reasonable inferences in his favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007). Initially, the burden is on the moving party to demonstrate that the evidence in the record creates no genuine issue of material fact. *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). While the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the admissible evidence in the record would be insufficient to carry the nonmovant's burden of proof at trial. *Celotex*, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. *Id.* at 324. The nonmoving party "cannot simply reassert factually unsupported allegations contained in its pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (*citing Celotex,* 477 U.S. at 325).

IV.   **<u>Discussion</u>**

    A.   **Plaintiff's Freedom of Expression Claim Fails.**

The law of the Third Circuit provides that a "public employee has a constitutional right to speak on matters of public concern without fear of retaliation." *Brennan v. Norton,* 350 F.3d 399, 412 (3d Cir. 2003) *citing Baldassare v. New Jersey,* 250 F.3d 188, 194 (3d Cir. 2001).

However, this right of expression is not absolute in that the public employer has a right to exercise some control over its work force. *Brennan,* 350 F.3d at 412 (citations omitted). In this Circuit, "a public employee's retaliation claim for engaging in protected activity must be evaluated under a three-step process." *Baldassare*, 250 F.3d at 194.

In order to prevail on a freedom of expression claim such as Plaintiff's claim here, the plaintiff must establish that the speech in question was protected. *Brennan,* 350 F.3d at 412. Plaintiff's speech is protected if: (1) the speech is a matter of public concern; and (2) his interest in the speech outweighs the employer's countervailing interest in promoting the efficiency of the public services it provides through its employees. *Baldassare,* 250 F.3d at 195 (citations omitted). Next, the plaintiff must show that the protected speech was a substantial or motivating factor in the alleged retaliatory action. *Brennan*, 350 F.3d at 413 (*citing Baldassare*, 250 F.3d at 195). Finally, if the plaintiff satisfies each of these steps, the burden shifts to the employer who must then rebut the employee's claim by demonstrating that the employer would have reached the same decision in absence of the protected conduct.[5] *Id*.

In the present case, it is not necessary for the Court to engage in a lengthy analysis to determine whether Plaintiff's speech is protected. Nor does the Court need to determine whether issues of fact exist as to whether Plaintiff's protected speech was a substantial or motivating factor in his termination. In fact, whether Plaintiff's speech is protected and whether such speech was the cause of his termination is immaterial because it is clear from the record that Plaintiff was terminated as the result of his own misconduct. Indeed, the record clearly

_____

[5]The Court notes for the record that Defendants concede that Plaintiff's speech is a matter of public concern. The parties disagree as to the weight of the parties' individual interests, however, as set forth herein, this Court need not address this issue.

illustrates that Plaintiff committed many violations of TSA policy, any of which would justify his termination.  Accordingly, even if Plaintiff is able to establish the three prongs necessary to build his claim, Defendants successfully rebut Plaintiff's claim by demonstrating that Plaintiff would have been terminated even in the absence of the arguably protected conduct.  *Baldassare*, 250 F.3d at 195; *Brennan,* 350 F.3d at 413.

As set forth above, Plaintiff was hired as a "probationary employee" and, as such, could be terminated during that probationary period "at any time during . . . the probationary period" SOF at ¶ 69.  Plaintiff committed numerous infractions of TSA policy, any of which could have been cause for termination.  In fact, Plaintiff could have been terminated even if he had not committed such violations of TSA policy.  Indeed, similarly situated employees who had not committed violations of TSA policy were also terminated during the same time frame.  During the spring/summer of 2003, the TSA implemented a reduction in force and slated 6,000 screeners nationwide for termination by September 30, 2003.  SOF at ¶ 61.  All probationary screeners were at risk because Pittsburgh was tasked with reducing its screening force by approximately 40 percent.  SOF at ¶ 61.  In accordance with this policy, 18 screeners had been terminated in Pittsburgh effective May 30, 2003.  SOF at ¶ 79.  Some of those terminated had required "no disciplinary actions of any sort." SOF at ¶ 79.   More terminations had been forecasted to meet the September 20, 2003 requirement. SOF at ¶ 79.  Certainly, Plaintiff, a probationary employee who violated TSA policy on several occasions, could be terminated when other probationary employees with "no disciplinary actions of any sort" were being terminated in furtherance of TSA's reduction in force. Docket No. 59 at 21.   Further, TSA, and other government agencies are "free to terminate both employees and contractors for poor

performance, to improve the efficiency, efficacy and responsiveness of service to the public."
*Bd. of County Commissioners, Wabaunsee County, Kansas v. Umbehr*, 518 U.S. 668, 674
(1996).  Finally, "absent contractual, statutory, or constitutional restriction, the government is
entitled to terminate them for no reason at all."  *Id*.  As set forth above, it is clear from the record
that Plaintiff is the instrument of his own undoing and no genuine issue of material fact exists as
to whether Plaintiff's termination resulted from anything other than his own misconduct.

**B.**     **Plaintiff's Freedom of Association Claim Also Fails**.

A public employee also has a constitutional right to freely associate with others without
the fear of retaliation. *See* U.S. Const. Amend. I; *Smith v. Ark. State Highway Employees, Local
1315*, 441 U.S. 463, 465 (1979) ("The public employee surely can associate . . . freely . . . and he
is protected by the First Amendment from retaliation for doing so").  While the Third Circuit has
not determined whether the "public concern" test and the balancing of interest test apply in the
context of First Amendment claims involving the right to associate, it is generally recognized by
the courts of the Third Circuit that "efforts of public employees to associate together for the
purpose of collective bargaining involve associational interests which the First Amendment
protects from hostile state action."  *Schlichter v. Limerick Township*, No. 04-4229, 2006 WL
2381970, *8 (E.D.Pa., Aug. 14, 2006) (*citing Labov v. Lalley*, 809 F.2d 220, 222-223 (3d Cir.
1987)); *see also Hitchens v. County of Montgomery*, No. 00-4282, 2002 WL 253939, *3
(E.D.Pa., Feb. 20, 2002) (noting circuit split as to whether public concern test applies to
associational conduct).  Accordingly, it would seem that a public employee's attempt to unionize
would always be a matter of public concern and would not be outweighed by a countervailing

government interest.  *Schlichter*, 2006 WL 2381970 at *8 (*citing Hitchens*, 2002 WL 253939 at *3).

Therefore, whether a plaintiff's First Amendment right to freedom of association has been violated in this context depends upon whether the conduct was a substantial and motivating factor in the government employer's decision.  "Employees . . . who claim that adverse employment action was taken against them based upon the exercise of their associational rights must show that they were engaged in constitutionally protected conduct, which conduct was a 'substantial' or 'motivating factor' in the government employer's decision." *Rode v. Dellarciprete*, 845 F.2d 1195, 1204 (3d Cir. 1988) (*citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).  This analysis requires a two step inquiry.  *Schlichter*, 2006 WL 2381970 at *8.  First, the court must determine whether there was an actionable adverse employment action taken against a public employee.  *Id.*  Next, the court must determine whether the motivation for such action was retaliation for the protected activity.  *Id*.

As set forth above, the Court need not determine whether the motivation for Plaintiff's termination was retaliation for the protected activity.  Indeed, Defendants have successfully rebutted Plaintiff's claim by demonstrating that Defendants would have reached the same decision to terminate Plaintiff in absence of the protected conduct.  *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989).  Therefore, Plaintiff's freedom of association claim fails for the same reason that his freedom of speech claim fails; Defendants have shown that Plaintiff would have been terminated even in the absence of the arguably protected conduct.  *Baldassare*, 250 F.3d at 195; *Brennan,* 350 F.3d at 413.

**C.**      **Plaintiff's Additional Argument Regarding Fact Discrepancies Lack Merit.**

This Court will address Plaintiff's argument that certain issues of fact exist which preclude the entry of summary judgment at this time.  As set forth above, Plaintiff failed to file a responsive statement of material facts in accordance with Local Rule 56.  Accordingly, the facts set forth in Defendants' SOF are deemed admitted for purposes of this motion and the Court accepts the same as true.  Even so, Plaintiff attempts to create issues of fact in an effort to avoid a summary judgment determination in Defendants' favor.   In that regard, Plaintiff alleges that several factual discrepancies create genuine issues of material fact such that summary judgment is improper.  Plaintiff argues that an issue of fact exists as to (1) who recommended Plaintiff's termination; (2) who authorized Plaintiff's termination; and (3) what was the motivation for Plaintiff's termination.  (Docket No. 67 at 7).  Additionally, Plaintiff argues that "[t]he factual discrepancy as found in the documentary evidence and depositions of Donna Hajduk, SM Rough, AFSD Martelle, and Mr. Pope suggest that a credibility determination is required in this case."  (Docket No. 67 at 7).  As set forth below, none of these factual discrepancies constitute a genuine issue of material fact precluding summary judgment.  Indeed, factual disputes that are irrelevant will not defeat summary judgment. *Anderson*, 477 U.S. at 248.  Accordingly, the Court finds that each of these purported factual disputes either is not disputed or is irrelevant to the issue before this Court, as set forth below.

First, no material issue of fact exists as to who recommended Plaintiff's termination.  Plaintiff attempts to create a factual dispute by implying that AFSD Martelle and Manager Rough did not recommended Plaintiff's termination.  (Docket No. 67 at 8).  However, this is not a genuine issue of material fact because, first and foremost, it is an undisputed fact that on July

16

7, 2003, William Rough and Craig Martelle signed a document which states, in pertinent part, "Please process the termination for James Ferace, Transportation Security Screener, for misconduct." SOF at ¶ 66. Moreover, even if Plaintiff could show that Martelle and Rough hadn't recommended his termination, he has not stated, and this Court cannot determine, why such a factual dispute would be material to the issue before the Court.

Next, the identity of the person who authorized Plaintiff's termination is irrelevant to the issues before the Court. Plaintiff attempts to create a factual dispute regarding who authorized his termination, but has not stated why this factual dispute is material. Docket No. 67 at 8-9. The Court agrees with Defendants' argument that any factual question regarding the identity of the ultimate "decision maker" is irrelevant, because legitimate reasons for Plaintiff's discharge were set forth in his termination letter and were supported by documentary evidence and the testimony of witnesses, as discussed above.

Next, Defendant alleges that an issue of fact exists as to the motivation behind Plaintiff's termination. As set forth above, the motivation behind Defendants' decision to terminate Plaintiff is not in dispute. Plaintiff was terminated as the result of multiple violations of TSA policy and upon recommendation of his supervisors for that reason. SOF at ¶ 69. Moreover, Plaintiff's union affiliation did not result in his termination. SOF at ¶ 71.

Finally, Plaintiff alleges that a credibility determination is required to interpret the testimony of Donna Hajduk, SM Rough, AFSD Martelle, and Mr. Pope and accordingly, summary judgment is not appropriate in this case. This argument fails because Plaintiff failed to dispute the relevant statements of such witnesses as set forth in Defendants' Statement of Undisputed Material Facts in Support of Summary Judgment. Accordingly, as set forth above,

17

such facts are deemed admitted pursuant to Local Rule 56.1 without the need for a credibility determination.

        **D.**     **Plaintiff is Not Entitled to Back Pay.**

        A plaintiff is entitled to back pay where he has suffered economic loss as the result of an employer's wrong.  *Hubbard v. EPA*, 982 F.2d 531, 534 (D.C. Cir. 1992).  Plaintiff is not entitled to back pay because, as set forth above, he has failed to make such a showing.

**V.**    **<u>Conclusion</u>**

        Accordingly, this 26th day of September, 2007, IT IS HEREBY ORDERED that Defendants' motion is **GRANTED**. An appropriate order follows.

Dated:  September 26, 2007                BY THE COURT:

                                        *s/ Nora Barry Fischer*

                                        Nora Barry Fischer

                                        United States District Judge

cc/ecf: Counsel of Record